should have endeavored to establish its validity at once. The moment that right was available to him, her possession became adverse.

We think the judgment should be affirmed, with costs.

Judgment affirmed, with costs and disbursements. All concur.

(109 App. Div. 252)

## LORD v. EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES et al.

(Supreme Court, Appellate Division, Second Department. November 24, 1905.)

1. INSURANCE—CHARACTER OF BUSINESS—MUTUAL PLAN—DEFINITION.

   Where a life assurance society's charter provided that its business should be conducted on the mutual plan, such provision should be construed to contemplate that the premiums paid by each member for insurance constituted a common fund to be devoted to the payment of losses as they might occur.

2. SAME—ORGANIZATION OF COMPANIES—CHARTERS—POWER OF LEGISLATURE—REPEAL.

   Laws 1853, p. 887, c. 463, as amended, provided for the organization of life insurance companies by "incorporators." Section 11 provided that all companies formed thereunder should be bodies corporate, subject to the Revised Statutes in relation to corporations, so far as the same are applicable, except as regards annual statements and "other matters hereinafter otherwise specially provided for," and section 20 declared that "every charter created by or under the laws of the state for the purposes aforesaid should continue until repealed. *Held*, that sections 11 and 20 did not render inapplicable to life insurance companies so organized Rev. St. pt. 1, c. 18, tit. 3, § 8, rendering the charter of every corporation subject to alteration, suspension, or repeal at the discretion of the Legislature.

3. CORPORATIONS—CHARTER—ALTERATION—CONSTITUTION—CONSTRUCTION.

   Const. art. 8, § 1, provides for the formation of corporations, and declares that all general or special laws passed pursuant to such section may be altered from time to time or repealed. *Held* that, under such section, the Legislature had power to alter the law under which a corporation was formed, for the purpose of regulating its affairs, without affecting its property rights or the contract rights of third persons, though such alteration might add to the burden of a stockholder by increasing his liability or diminishing the value of his stock, or change the name, officers, or proportion in management and control of the corporation.

4. INSURANCE—CORPORATIONS—ORGANIZATION—MUTUALIZATION—STATUTES.

   Defendant assurance society having been organized under Laws 1853, p. 887, c. 463, section 3 of which provided that the incorporators should file a declaration comprising a copy of the charter they proposed to adopt, setting forth the name of the company, the manner in which its corporate powers should be exercised, the manner of electing trustees, directors, and officers, etc., and having adopted a charter providing for the election by stockholders of 52 directors, and authorizing such directors by a three-fourths vote to permit policy holders to vote at any annual election, the directors had no power, under Insurance Law, Laws 1892, p. 1955, c. 690, § 52, providing for the reorganization of existing insurance companies, to so amend its charter as to authorize the election of a majority of the directors or trustees by the policy holders to the exclusion of stockholders.

   Hooker, J., dissenting.

Appeal from Special Term, Nassau County.

Suit by Franklin B. Lord against the Equitable Life Assurance Society of the United States impleaded with others. From an inter-

locutory judgment overruling defendant's demurrer to plaintiff's amended complaint, and from an order granting a preliminary injunction (94 N. Y. Supp. 65), the society appeals.    Affirmed.

Argued before BARTLETT, WOODWARD, HOOKER, RICH, and MILLER, JJ.

Wm. B. Hornblower (Adrian H. Joline, Wm. N. Cohen, and Bainbridge Colby, on the brief), for appellant.

Edward M. Shepard (Henry DeForest Baldwin, on the brief), for plaintiff respondent.

George Zabriskie, for other respondents.

WOODWARD, J.    There are two appeals in this case—one from an interlocutory judgment overruling the demurrer of the defendant, the ground stated being that the complaint failed to state facts sufficient to constitute a cause of action, and the other from an order granting a preliminary injunction.    It is conceded by all of the parties that, if the facts set forth in the complaint are sufficient to constitute a cause of action, then the preliminary injunction is within the discretion of the court at Special Term, and ought not to be disturbed.    It will not, therefore, be necessary to devote any part of the discussion to the order of injunction, and we shall confine ourselves to the questions of law presented upon the appeal from the interlocutory judgment.    Several parties have been permitted by order of the court to intervene, but no new questions are presented by such interveners, so that the controversy will be treated as between the plaintiff and the defendant the Equitable Life Assurance Society of the United States.

The Equitable Life Assurance Society of the United States was incorporated in 1859, under and in pursuance of the laws of this state relating to corporations, and more especially under the provisions of chapter 463, p. 887, of the Laws of 1853.    The plaintiff is the owner and holder of 36 shares of the capital stock of the defendant, 23 of which were subscribed for by plaintiff's father, Daniel D. Lord, he being one of the original corporators.    Upon the organization of the defendant society, the corporators filed a declaration with the Comptroller of the state, signed by each of them, setting forth their intention to form a company for the purposes named in said act, which declaration comprised a copy of the charter the said corporators proposed to adopt.    This declaration, with the copy of the proposed charter, was submitted to the Attorney General of the state in the manner pointed out by the statute, and all of the steps were taken necessary to complete the organization of the company, and to launch it in a business career, with a paid-up capital stock of $100,000, which sum was, under the provisions of law, deposited with the Comptroller of the state as a guaranty fund for the benefit of those who should take out policies of insurance.    The charter, after declaring that the company should be entitled to all the rights and privileges provided by the statutes, and that it should be subject to all of the obligations imposed by law, provided that the capital of the defendant should be $100,000 in cash, divided into 1,000 shares of $100 each, which should be personal property, transferable only on the books of the company, in conformity with its by-laws; that the holders of the said capital

stock might receive a semiannual dividend on the stock not to exceed 3½ per cent.; that the earnings and receipts of said company, over and above the dividends, losses, and expenses thereof, should be accumulated; that the corporate powers of said company should be vested in a board of directors, and should be exercised by them and by such officers and agents as they might appoint; that the board of directors should consist of 52 persons, a majority of whom should be citizens of the state of New York, and each of whom should be the proprietor of at least five shares of the capital stock of the company; that the said directors should be chosen by ballot; that a plurality of votes should elect; and that in the election of directors every stockholder in the company should be entitled to one vote for each share of stock held by him, and that such vote might be given in person or by proxy. It was likewise provided that at any time after the incorporation of the defendant, the board of directors thereof might, after giving notice at the two previous stated meetings of the said board, by a vote of three-fourths of all the directors, provide that each holder of a life policy of the defendant, who should be insured by the defendant in the sum of not less than $5,000, should be entitled to one vote at the annual election, and that such vote should be given in person, and not by proxy. It was also provided that the business of the company should be conducted on the mutual plan, which has been judicially declared to contemplate that the premiums paid by each member for the insurance of his property or life constitute a common fund, devoted to the payment of any losses that may occur (Union Insurance Co. v. Hoge, 62 U. S. 35, 64, 16 L. Ed. 61); and to still further carry out the idea of mutuality, it was provided that the board of directors might, at stated intervals, determine the condition of the finances of the company, and, after making provision for all liabilities, accrued and contingent, apportion an equitable proportion of the surplus among the policy holders; the details of the plan having no particular bearing upon the questions here presented. It is alleged, and admitted by the demurrer, that the business of the company has increased each year, and that there are at present outstanding upwards of 560,000 policies of life insurance written by the defendant, the amount insured aggregating a sum in excess of $1,495,000,000; that in each and every year of such business of the defendant, its assets, after deducting all debts and liabilities, have fully and sufficiently provided for all contingent liabilities upon its policies and otherwise, and that after such provision there has been each year a surplus of such assets over and above ample provision for all liabilities actual and contingent, and that these assets have steadily increased; that at the present time the gross assets of the company are sufficient to provide for all its debts and liabilities, actual and contingent, to abundantly secure and cover all liabilities to policy holders, and, as such policies shall mature and become payable, to pay the same off according to the terms of the said policies, and thereafter to provide and leave a large surplus of assets greatly exceeding the said original capital of $100,000, to which surplus and assets thus remaining it is claimed the holders of shares of stock of the defendant are lawfully entitled; that this surplus, which has been accumulated, amounts to upwards of $80,000,000, and while this sum is not to be disposed of

in this litigation, it is claimed on the part of the plaintiff that the stockholders, as the equitable owners of the company's assets, may not be deprived of the absolute control of this vast fund, as well as the general business of the company, by any change of the charter which shall admit to the voting privileges of the company the thousands of policy holders, as has been attempted by the board of directors.

On the 16th day of February, 1905, steps were taken on the part of certain persons prominently identified with the defendant to bring about what they were pleased to call a mutualization of the Equitable Assurance Society of the United States. This movement went through various stages, resulting in the board of directors adopting a proposed new charter for the defendant, under the provisions of section 52 of the insurance law, as amended by chapter 725, p. 1802, of the Laws of 1893. The salient feature of this proposed new charter, and the one which the plaintiff seeks to prevent going into operation, provides that of the 52 members of the board of directors, 28 shall be chosen by the policy holders and 24 by the stockholders, the result to be brought about by the following method:

"Six of the vacancies occurring annually among the directors, by the expiration each year of the term of office of one of said four classes, shall be filled by a plurality vote of the stockholders in the company, and each of said stockholders in the election to fill such vacancies shall be entitled to one vote for every share of stock held by him; such vote to be given in person or by proxy. The other seven vacancies so occurring annually shall in like manner be filled by a plurality vote of the policy holders in the company, and in the election to fill such vacancies each policy holder in the company who shall have been such for at least twelve months prior to the date of such election shall be entitled to one vote, which may be given in person or by proxy. In case the number of directors shall at any time be reduced to less than fifty-two, the numbers elected by stockholders and policy holders, respectively, shall be in the proportion of six to seven; and these proportions shall not be changed without the consent of the holders of three-fifths of the stock of the company.",

The broad question presented upon this appeal is whether the board of directors of the defendant has the power to take from the stockholders the ultimate power of control over the affairs of the Equitable Life Assurance Society, and vest such control in the policy holders; for it is obvious that if the policy holders may elect a majority of the board of directors under all circumstances, they may absolutely divest the stockholders of the control of the affairs of the company, and may thus, under the other powers vested in the board of directors, distribute the surplus which has been accumulated in excess of the legitimate needs of safe insurance upon the mutual plan. The plaintiff urges that there is no power in the Legislature to authorize such a change in the management of the affairs of the defendant, and that, if such power does exist, it has not been exercised, and that the action of the board of directors is without warrant of law and void. The learned court at Special Term has held with the plaintiff, relying particularly upon the lack of legislative power to amend the defendant's charter; and we are thus called upon to consider the question of the limitations of the legislative power as fixed by the state and federal Constitutions.

Chapter 463, p. 887, of the Laws of 1853, under which the defendant was organized, and under which, with its amendments, it has been

conducted, provided that any number of persons, not less than 13, might associate for the purpose of forming a corporation to engage in life and health insurance. By section 3 of said act it was provided that these persons should be known as corporators, and they were required to file in the office of the comptroller a declaration signed by each of the corporators. setting forth their intention to form a company for the purposes named in the act, which declaration was to comprise a copy of the charter proposed to be adopted by them, and the said charter was to set forth the name of the company; the place where it was to be located; the kind of business to be undertaken; the mode and manner in which the corporate powers were to exercised; the manner of electing the trustees or directors and officers, a majority of whom should be citizens of this state; the time of such election; the manner of filling vacancies; the amount of capital to be employed— and such other particulars as might be necessary to explain and make manifest the objects and purposes of the company and the manner in which it was to be conducted. Other sections provided the details of perfecting the organization, but they are not important to be considered here, and by section 11, p. 890:

"All companies formed under this act shall be deemed and taken to be bodies corporate and politic. in fact and in name, and shall be subject to all the provisions of the Revised Statutes in relation to corporations. so far as the same are applicable, except in regard to annual statements and other matters herein otherwise specially provided for."

At the time the defendant was organized, section 8, tit. 3, c. 18, pt. 1, of the Revised Statutes, provided that the "charter of every corporation that shall hereafter be granted by the Legislature, shall be subject to alteration, suspension or repeal, in the discretion of the Legislature," and it seems to be conceded that if this provision related to the defendant, it is conclusive upon the power of the Legislature to make changes in the corporate management of the company. But it is urged that life insurance companies organized under the provisions of chapter 463, p. 887, of the Laws of 1853, are exempt from this particular provision of the Revised Statutes, because of the exemption clause in section 11, and of the provisions of section 20, p. 896, of the same act, which declares that "every charter created by or under the laws of this state for the purposes aforesaid, shall continue until repealed." This, it is claimed, is one of the "other matters herein otherwise specially provided for," within the meaning of section 11 of the act, and takes life insurance companies out of the control of the reserved power contained in the Revised Statutes. Our attention is called to the fact that the Legislature in the same year adopted chapter 466, providing for the organization of fire insurance companies, and that this act contains no similar provision to that of section 20, c. 463, p. 896, of the Laws of 1853, and that it does contain a provision reserving to the Legislature the power to alter, amend, or repeal the charter, and this is said to indicate an intention on the part of the Legislature to perpetually waive the right to alter or amend the defendant's charter. We are not impressed with this reasoning. It seems to us entirely clear that the Legislature undertook in the two acts of 1853 to adopt an insurance law which should provide for two different classes of insurance, and

that the provision of section 20, c. 463, p. 896, of the Laws of 1853, was designed solely for the purpose of enabling life insurance companies to have the power to carry out their life contracts with policy holders, and not as a limitation upon the power of the Legislature, or as a repeal of the Revised Statutes in so far as they provided for the reservation of power in the Legislature to alter, amend, or repeal the charters of insurance companies. Chapter 308, p. 441, of the Laws of 1849, constituted the general insurance law up to 1853. Section 15, p. 448, of that act provided that all "charters formed or extended under this act shall be of thirty years' duration each, except those of life insurance, but the Legislature may at any time alter, amend or repeal this act, or dissolve and provide for closing up the business and affairs of any company formed under it." Section 17 provided that all provisions of the Revised Statutes applicable to corporations shall apply, the same as was provided subsequently in chapter 463, p. 887, of the Laws of 1853. When the Legislature came to separate the life insurance law from the fire insurance law, it provided that the latter should have charters which were to endure for 30 years, subject to the right of the Legislature to alter, amend, and repeal (section 26, c. 466, p. 920, Laws 1853), and that the charters of the former should "continue until repealed" (section 20, c. 463, p. 896, Laws 1853). If we consider the nature of life insurance, that it is a continuing contract, and that each policy holder in the payment of his annual premium is not only paying the insurance of the current year, but is paying for the privilege of having the insurance continue when he could not get insurance, we shall see that section 20 of the life insurance law as it was enacted in 1853 has no other purpose than to extend the life of such companies, so that they may at any time enter into a contract which they will be prepared to carry out, subject only to the right of the Legislature to repeal the same. At most, it is a pledge on the part of the state that the charter, in so far as it relates to the rights of policy holders, shall remain intact unless the Legislature should elect to repeal the same, in which event it must be presumed that the Legislature would provide some means of fulfilling the contracts which were then in existence. It does not pretend to limit the power of the Legislature. It is a declaration merely of the perpetuity of the charter, as it relates to the contracts with third persons, until the Legislature shall elect to repeal the same. "We agree with the court below," say the court in New York Life Ins. Co. v. Statham, 93 U. S. 24, 30, 23 L. Ed. 789, "that the contract is not an assurance for a single year, with a privilege of renewal from year to year by paying the annual premium, but that it is an entire contract of assurance for life, subject to discontinuance and forfeiture for nonpayment of any of the stipulated premiums. Such is the form of the contract, and such is its character. * * * Each installment is in fact part consideration of the entire insurance for life. * * * The value of assurance for one year of a man's life when he is young, strong, and healthy is manifestly not the same as when he is old and decrepit." See, also, People v. Security Life Ins. & Annuity Co., 78 N. Y. 114, 124, 34 Am. Rep. 522; Whitehead v. New York Life Ins. Co., 102 N. Y. 143, 152, 6 N. E. 267, 55 Am. Rep. 787. A life insurance company which was limited in its

life to 30 years could not enter into a life contract with any man whose expectancy reached beyond that period. The sole purpose of section 20 in the life insurance law of 1853 was to remove all time limit, and to permit companies organized under its provisions to make life contracts of insurance; or, in other words, it was the purpose of the Legislature to enable companies organized under this law to make the contracts and to execute them in conformity with the obvious purpose of such contracts. It was not designed to limit the provisions of the Revised Statutes in reference to the power to amend, alter, and repeal charters, but took the place of the 30-year limitation to be found in the fire insurance act of the same year.

If we are correct in this conclusion, that the defendant's charter was subject to the provisions of the Revised Statutes, and that it was "subject to alteration, suspension, and repeal, in the discretion of the Legisislature," then it is unnecessary to consider the effect of the provisions of section 1, art. 8, of the Constitution of this state. However, as the learned court at Special Term determined the question, and the importance of the litigation demands that all phases of the matter should be finally disposed of at the earliest possible moment, it may not be out of place briefly to revert to the constitutional aspects of the case. This provision of the Constitution is that:

"Corporations may be formed under general laws; but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the Legislature, the objects of the corporation cannot be attained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed."

This provision of the Constitution has existed since 1846, and was concededly adopted to avoid the rule established in the Dartmouth College Case, and it seems to us that it is late in the history of the jurisprudence of this state to attempt to make a distinction between the power to alter or repeal a general or special law and the power to amend or repeal the charter of a corporation organized under such general or special law by means of an amendment to the law. It is undoubtedly true that the Legislature, in the absence of a reservation of such power, may not amend or repeal a charter in such a manner as to take away vested rights of property; it may not create a corporation, and give it authority to become possessed of franchises and other property, and, when the same have become vested, arbitrarily step in, and by a repeal or amendment of the charter transfer such franchises or other property to third persons, or confiscate them to the uses of the state. This was clearly the extent of the decision in People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684, for in Mayor v. Twenty-Third Street R. Co., 113 N. Y. 311, 317, 21 N. E. 60, it was said:

"It is difficult to put precise limits upon the power of the Legislature thus reserved over corporations created by it or under its authority. Under its reserved power, it cannot deprive a corporation of its property, or interfere with or annul its contracts with third persons"; citing the O'Brien Case, supra.

"But it may," continue the court, "take away its franchise to be a corporation, and may regulate the exercise of its corporate powers. As it has the power utterly to deprive the corporation of its franchise

to be a corporation, it may prescribe the conditions and terms upon which it may live and exercise such franchise. It may enlarge or limit its powers, and it may increase or limit its burdens." This is the construction the Court of Appeals places upon the statutory and constitutional provisions which are involved in the case now before us, and a long line of cases cited by the court at page 318 amply sustains this construction. The obvious intent of the constitutional provision is that the Legislature, in adopting a statute under which a corporation is to be created, reserves to itself the power to alter or repeal the law, and an alteration of the law which went to the regulation of the corporate affairs of the company, without affecting its property rights or the contractual rights of third parties, would clearly be within the reserved power. In the O'Brien Case, supra, which is relied upon by the plaintiff, the court say: .

"We must also be understood as referring only to such franchises as are usually authorized to be transferred by statute, viz., those requiring for their enjoyment the use of corporeal property, such as railroad, canal, telegraph, gas, water, bridge, and similar companies, and not to those which are in their nature purely incorporal and inalienable, such as the right of corporate life, the exercise of banking, trading, and insurance powers, and similar privileges. The franchises last referred to, being personal in character, and dependent upon the continued existence of the donee for their lawful exercise, necessarily expire with the extinction of corporate life, unless special provision is made otherwise."

The discussion in that case is to be considered in connection with the facts there involved—in connection with a corporation having public franchises—and has no relation to a corporation such as the Equitable Assurance Society of the United States.

In the recent case of Hinckley v. Schwarzchild & Sulzberger Co. (not yet officially reported) 95 N. Y. Supp. 357, Mr. Justice Hatch reviewed the authorities upon the question of the reserved powers of the Legislature in reference to corporations under the provisions of the state Constitution, and says:

"These cases would seem to authorize the conclusion that acts which do no more than regulate and control the internal management of a corporation so far as it has relation to the public and concerns the policy of the state are within the power to alter and repeal, even though the exercise of the power adds to the burden of the stockholder by increasing his liability, or diminishes the value of his stock, or changes the name, offices, or proportion in management and control of the corporation. Within this power, under this rule, must necessarily fall the right to change the capital stock of the corporation as to amount, kind, and classification. In effect, it must be deemed to exhibit the policy of the state adopted to promote the corporate purpose, enhance its welfare, and extend its business."

While the authorities are, as we believe, clear upon the proposition stated by Mr. Justice Hatch in reference to corporations generally, we are equally persuaded that in reference to life insurance companies the power may be very appropriately exercised. As we have already pointed out, the character of life insurance contracts is peculiar. The annual premiums not only pay the current risk, but they constitute partial payments upon the full life term, subject to forfeiture under certain stated conditions, and the policy holders are peculiarly interested in the life of the company and the method of its management.

In fact, as a practical proposition, although the policy holders technically occupy the relation of creditors to the corporation, they are the capitalists; they are the ones who furnish the money upon which the business is conducted. "The insured parties are associates in a great scheme. This associated relation exists whether the company be a mutual one or not. Each is interested in the engagements of all, for out of the coexistence of many risks arises the law of average, which underlies the whole business." New York Life Ins. Co. v. Statham, 93 U. S. 24, 31, 23 L. Ed. 789. The original stock subscription of $100,000, under the provisions of the law as it stood at the time of the organization of the defendant company, was invested in securities and deposited with the comptroller, and this capital has never been employed in the business, except as it has stood as a guaranty fund for the payment of policies. All the rest of the capital, with a surplus of $80,000,000, has been contributed by the policy holders in a company which pledged itself in its charter to conduct its business on the mutual plan, and to distribute at intervals an equitable proportion of the surplus, after providing for all of the liabilities of the company. The original investment is hardly a factor in the affairs of the company. It has never been invested in the sense that capital is invested in a manufacturing corporation, and while the stockholders are technically the equitable owners of the assets of the corporation, the policy holders, who have life contracts to be fulfilled, and who have been promised an equitable distribution of the surplus, are the ones who have furnished all of the active capital as well as all the vast surplus. Nearly $1,500,-000,000 of these policies are now outstanding, over 500,000 people are annually contributing to the resources of the defendant, and each one of these contributors, if he is the holder of a life policy, has an interest in the company, a tangible interest in the surplus and the continued solvency of the corporation. Why then, if the Legislature should deem it imprudent to trust these assets and the corporate business to the directors chosen by the representatives of the $100,000 of the original capital stock, should there be any question as to the authority of the sovereign power of the state to change the method of electing directors? The stockholders would not be deprived of any property; they would still have their stock; they would still have the right to participate in the assets of the corporation to the extent of their holdings in the event of the corporation going into dissolution; they would still have a right to participate in the choice of directors; they would still have equitable rights which the courts might protect in the event of abuses in the management of the company; they would have all of the rights which they now have, except the right of the representatives of $100,000 of idle capital to control the millions of dollars of assets of the defendant which are dedicated to the interests of policy holders, and in this they would have a voting power all out of proportion to the amount of their investment. What is there in this inconsistent with the right of the Legislature to amend the charter, and to take from the stockholders a portion of their powers over the affairs of a corporation in which so many are vitally and financially interested? There is no presumption that directors elected by policy holders would be false to their trusts, or that they would arbitrarily exert their power, even

though they constituted a majority of the board. They would still be charged with the duty of honestly managing the affairs of the corporation in the interests of the corporation; it would still be their duty to administer the funds belonging to the corporation under the letter and the spirit of the law, and every dollar's worth of stock would be owned by the same persons who own it now, or their assigns, and the stockholders would have the same property interest in the corporation that they now have. Surely, it may not be said that it is not within the reserve power of the state to so regulate the internal affairs of one of its own creations that the creature may not be compelled to carry out in good faith the purposes for which it was created, and what is necessary in this regard is within the discretion of the Legislature. Whether the scheme which is proposed, and which is now before us, is a good one or not, is not here for determination. We are dealing now with a question of power, and we have no doubt that the Legislature might, if it saw fit, so amend the law of this state as to permit the choice of a majority of the directors of the defendant company. Whether it has done so is quite another question, which we will now discuss.

The authority to make the radical change in the control of the defendant's corporate affairs is claimed to be found in section 52 of the insurance law (Laws 1892, p. 1955, c. 690), as amended by chapter 725, p. 1797, of the Laws of 1893; in connection with the original statute under which the company was organized. Section 52 provides that:

"Any domestic corporation existing or doing business at the time this chapter takes effect, may, by a vote of a majority of its directors or trustees accept provisions of this chapter and amend its charter to conform with the same, upon obtaining the consent of the superintendent of insurance thereto in writing; and thereafter it shall be deemed to have been incorporated under this chapter, and every such corporation in reincorporating under this provision, may for that purpose so adopt in whole or in part a new charter, in conformity herewith, and include therein any or all provisions of its existing charter, and any or all changes from its existing charter, to cover and enjoy any or all the privileges and provisions of existing laws which might be so included and enjoyed if it were originally incorporated thereunder, and it shall, upon such adoption of and after obtaining the consent, as in this section before provided, to such charter, and filing the same and the record of adoption and consent in the office of the superintendent of insurance, perpetually enjoy the same as and be such corporation, and which is declared to be a continuation of such corporation which existed prior to such reincorporation. * * * Every domestic insurance corporation may amend its charter or certificate of incorporation by inserting therein any statement or matter which might have been originally inserted therein; and the same proceedings shall be taken upon the presentation of such amended charter or certificate to the superintendent of insurance as are required by this chapter to be taken with respect to an original charter or certificate, and if approved by the superintendent of insurance, and his certificate of authority to do business thereunder is granted, the corporation shall thereafter be deemed to possess the same powers and be subject to the same liabilities as if such amended charter or certificate had been its original charter or certificate of incorporation, but without prejudice to any pending action or proceeding or any rights previously accrued."

It seems entirely clear to us that the provisions of section 52 of the insurance law do not contemplate any radical change in the character of any domestic insurance company. The insurance law is, in effect, a codification of the insurance law of the state as it existed at the time of the enactment, and the provisions of section 52 are merely intended to per-

mit companies organized under special acts or under previously exist-
ing statutes to come within the particular provisions of the codified law,
more as a matter of convenience than as one of substance; and it was not
thought necessary to require more than the action of the board of
directors to accomplish this purpose.  If it had been contemplated that
existing stock corporations were to have the power to enlarge the
electorate, or to radically change the control, it can hardly be doubted
that the act would have required greater conservatism in action.  The
last clause of the section, which provides that "every domestic insur-
ance corporation may amend its charter or certificate of incorporation
by inserting therein any statement or matter which might have been
originally inserted therein," does not, in our opinion, contemplate a
revival of the statutes as they may have existed at the time of the in-
corporation of the Equitable Life Assurance Society of the United
States, but is merely intended to permit of corrections or alterations
in the charter, to make it conform with the law as it now exists, or to
meet any particular situation which the law now sanctions.  It cer-
tainly was not intended to permit a company organized half a century
ago to amend its charter in accord with the law of that time in respect
to matters in which the policy of the state has changed, and it fulfills
its obvious purpose when limited to permission to make such changes
as the law now contemplates.  But even were this not so, we are un-
able to find in the insurance law of 1853, as modified and limited by the
Revised Statutes of that time, any justification for admitting to the
electorate of life insurance companies the policy holders thereof.
Section 3, c. 463, p. 887, of the Laws of 1853, under which the defend-
ant was organized, provided that the incorporators should file in the office
of the comptroller a declaration, which should comprise a copy of the
charter they proposed to adopt, and the said charter "shall set forth
the name of the company; the place where it is to be located; the
kind of business to be undertaken;  *  *  *  the mode and manner
in which the corporate powers of the company are to be exercised;
the manner of electing the trustees or directors and officers, a majority
of whom shall be citizens of this state, and the time of such elections;"
etc., and it is claimed that under this provision in reference to the man-
ner of electing directors, it was competent for the original incorporators
to include a plan for permitting the policy holders to participate in the
election, and that this may now be done under the provisions of section
52 of the insurance law.  But, as we read the provision of the insur-
ance law as it existed in 1853, in connection with the Revised Statutes
of those days, the intent was not to permit the corporators to enfran-
chise policy holders, or others outside of the stockholders, but to point
out the manner of election, to determine whether the 52 directors
should be elected annually in a body on a single ticket, or individually,
or in groups; a portion retiring each year.  The power given to the cor-
porators was to determine the manner of elections, not the qualifica-
tions of electors; and, in the absence of special statutory provisions,
no one would be entitled to a vote in the choice of directors unless
he was a member of the corporation, and unless he had legal interests
involved in the election.  The statute dealt with the formation of the
corporation.  There were no policy holders when the corporation was

organized, and there could therefore be no authorization for the voting of any such persons at the first election; and, in the absence of legislative provisions, there could be no justification for adding to the electorate those who would not have been authorized to vote at the first meeting for the election of directors. The statute creates a body composed of individual stockholders. These are the members of the corporation, and they are the only ones having any rights until it is organized and begins the transaction of business. The policy holder does not become a member of the corporation. He is a third party, holding a contractual relation with the corporation as a distinct entity, and while he holds a relation which the state may properly protect by giving him a voice in the election of directors, we do not think that the Legislature has ever provided for doing this; and, in the absence of a specific provision of this kind, we think the general language of section 52 of the insurance law, and the provisions of the statute under which the defendant was organized, in connection with the Revised Statutes as then in force, do not operate to give the board of directors of the defendant power to entirely alter the corporate control of the company. Section 20 of the stock corporation law (Laws 1892, p. 1828, c. 688) provides that the "directors of every stock corporation shall be chosen from the stockholders," and, by necessary inference, the choice is to be made by the stockholders, who alone constitute the membership in the corporation. By the same section it is provided that policy holders of an insurance corporation shall be eligible to election as directors, and section 27 of the same act makes policy holders of insurance corporations eligible to election or appointment as officers of such corporations; but nowhere in the laws of this state do we find any provisions authorizing the policy holders to take upon themselves the duties or obligations of members of the corporation to the extent of becoming the electorate of such corporation. It would naturally seem as though, if it were intended by the Legislature that persons occupying merely contractual relations with the corporation were to be intrusted with the power to elect, and thus to control the corporation, there would be some provision for making the policy holders answerable, in some measure, at least, for the conduct of the corporation; but we look in vain for any provision of this kind. All of the duties and responsibilities are confined to the members of the corporation and the corporation itself, acting through its board of directors, while there are no duties imposed upon the policy holders. The policy holder does not even contract to keep his policy in force for any given length of time. He contracts for a life term, subject to forfeiture if he fails to pay his premiums; and this is the extent of his liability. He may fail to pay his premiums at any time, and his obligations cease; and it would be strange if the Legislature, without some provisions for conserving the rights of stockholders, should turn over the control of insurance companies, by the mere action of the board of directors, to the control of those who might be without a particle of interest in the affairs of the corporation before the end of the period for which the directors were elected. We do not say that the Legislature has not the power to do this. That is a question which may be disposed of when it has attempted to exercise such a power;

but we do say that, in the absence of positive enactments, giving the power of control over to policy holders, the courts ought not to seek for strained construction to give this power, even though it be called "mutualization." So radical a change in the policy of the state in respect to this most important branch of its policy ought to be clearly manifest in the statutes of the state before it is put into operation by the mere vote of a board of directors, who were not chosen with any view to the possibility of such action.

The interlocutory judgment appealed from should be affirmed, with costs, and the order of injunction should be sustained, with costs All concur, except HOOKER, J., who dissents.

WILLARD BARTLETT, J. I concur in the result, on the ground that under existing laws there is no power in the board of directors of the Equitable Life Assurance Society so to amend its charter as to deprive a stockholder of the right to participate in the election of every director of the corporation. While the board may permit policy holders to vote for every director, it cannot lawfully exclude stockholders from the exercise of the same right.

HOOKER, J. (dissenting). I do not concur in the view that the interlocutory judgment should be affirmed The defendant the Equitable Life Assurance Society was incorporated in the year 1859 under the provisions of chapter 463, p. 887, of the Laws of 1853, relating to the incorporation of life insurance companies. That chapter provided that the corporators file a declaration in the office of the Comptroller, setting forth their intent to form a company, comprising a copy of the proposed charter, and that the charter show, among other things, the "manner of electing the trustees or directors and officers." In this respect the charter proposed, and which actually became the charter of the society, provided:

"The board of directors shall consist of fifty-two persons, a majority of whom shall be citizens of the state of New York, each of whom shall be a proprietor of at least five shares of the said capital stock. * * * In the election of directors, every stockholder in the company shall be entitled to one vote for every share of stock held by him, and such vote may be given in person or by proxy. At any time hereafter, the board of directors, after giving notice at the two previous stated meetings, may, by a vote of three-fourths of all the directors, provide that each life policy holder, who shall be insured in not less than five thousand dollars, shall be entitled to one vote at the annual election of directors, but such vote shall be given personally and not by proxy."

On the 21st day of March, 1905, the board of directors of the society adopted a proposed amended charter, which they intend to submit to the superintendent of insurance of the state of New York for his approval. It is also their intention, unless restrained by the intervention of this court, to procure approval by the superintendent of the amended charter, to the end that the affairs of the society may hereafter be administered thereunder. The provisions of the proposed amended charter which are obnoxious to the plaintiff are these:

"The board of directors shall consist of fifty-two persons, a majority of whom shall be citizens and residents of the state of New York, each of whom shall be a policy holder or a proprietor of at least five shares of the said

capital stock. * * * The directors shall be chosen by ballot by the stockholders and policy holders in the company in the .following manner: Six of the vacancies occurring annually among the directors, by the expiration each year of the term of office of one of said four classes shall be filled by a plurality vote of the stockholders in the company, and each of said stockholders in the election to fill such vacancies shall be entitled to one vote for every share of stock held by him, such vote to be given in person or by proxy. The other seven vacancies so occurring annually shall in like manner be filled by a plurality vote of the policy holders in the company, and in the election to fill such vacancies each policy holder in the company who shall have been such for at least twelve months prior to the date of such election shall be entitled to one vote, which may be given in person or by proxy. In case the number of directors shall at any time be reduced to less than fifty-two, the numbers elected by stockholders and policy holders, respectively, shall be in the proportion of six to seven; and these proportions shall not be changed without the consent of the holders of three-fifths of the stock of the company."

The plaintiff is the owner of 36 shares of the capital stock of the society. The capital stock is $100,000, divided into 1,000 shares of the par value of $100 each. The business of the society has been eminently successful ever since its incorporation, until now there are 560,000 policies of life insurance outstanding issued by it, the amount thus insured exceeding the sum of $1,495,000,000. At the present time the society has a surplus of more than $80,000,000, over and above such assets as would be necessary to meet its contingent and fixed liabilities.

Claiming that the admission of policy holders to vote for and elect a majority of the directors of the society, as contemplated by the proposed amended charter, would be in derogation of his rights as one of the owners of the society's capital stock, the plaintiff has instituted this action in equity to restrain its directors, officers, and employés from presenting to the superintendent of insurance or filing the proposed amended charter, or any other amended charter, whereby his rights as a stockholder shall be in any way affected or impaired. To his complaint the society has demurred, on the ground that it does not state facts sufficient to constitute a cause of action, and now appeals from an interlocutory judgment overruling the demurrer. The act of 1853, under which the society was incorporated, did not in terms contain a reservation to the Legislature of the right to alter, amend, or repeal the charter of any corporation organized thereunder. The plaintiff's claim for relief is based upon three propositions: First, there was not reserved to the Legislature the privilege of amending or altering the society's charter; second, that he and the other stockholders of the society have vested rights, in the nature of property rights and contract rights, which entitle them to vote for all the directors of the society, and which rights cannot lawfully be taken away or impaired under reserved legislative authority by any amendment of the charter; and, third, that the proposed amended charter is not authorized by the provisions of the statute under which the directors have assumed to act.

In respect of the first proposition, I agree in the conclusion expressed in the prevailing opinion. At the time the society was incorporated, and ever since then, the Constitution of the state contained the following provision:

"Corporations may be formed under general laws; but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the Legislature, the objects of the corporation cannot be attained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed." Section 1, art. 8, Const. 1846, N. Y.

It is claimed by the learned counsel for the respondent that this constitutional provision was not self-operative, and that a charter granted under a special act or general law after the Constitution of 1846 went into effect could not be altered, unless the special act or general law itself specifically so provided. It is conceded on every hand that this provision found its way into the fundamental law, to remedy the consequences of the decision of the Supreme Court of the United States in Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. Ed. 629, the effect of which was that, in the absence of reservation of power to do so, a state Legislature might not alter the charter of a corporation organized under and by virtue of its laws   Full effect should be given to the evident intent of the constitutional provision. The power to amend or alter a general law or special act, under and by force of which a corporation springs into being, carries with it the power to alter the charter of the corporate body itself; for the body exists by reason of the act and rests for the protection and enjoyment of its rights and privileges upon its grants. The charter is to such extent one with the act which creates it; that power to alter the latter must imply power to alter the charter itself. This view is supported by authority   In Barnes v. Arnold, 45 App. Div. 314, 61 N. Y. Supp. 85, affirmed 169 N. Y 611, 62 N. E. 1093, the court said

"But it seems to us that it is not necessary to have recourse in this instance to what is termed the 'reserve power' of the Legislature, for the reason that the right to alter and amend any corporate privileges granted by the state is clearly conferred by the fundamental law itself. By article 8 of the Constitution of 1846, to which it is conceded on all hands the enactment of 1892 must conform, it was provided, among other things, as follows, viz.: 'Section 1. Corporations may be formed under general laws, but shall not, except in certain cases, be created by special act,' and that 'all general laws and special acts passed pursuant to this section may be altered from time to time or repealed.' * * * Here, then, is conferred upon the Legislature in unmistakable terms the power to create any and all corporations by general laws, the right to alter and amend, in its discretion, all such laws, and the power to enact such measures as will secure the creditors of all corporations thus formed by the individual liability of the incorporators, or by such other means as may be deemed available. How could a grant of legislative power be more liberally conferred or more clearly defined, and how could the members of any corporation created while these provisions were in operation possibly misconstrue their force and effect?"

Having reached the conclusion that the power to alter or amend was vested in the Legislature, the second question for determination is whether or not that power is sufficiently comprehensive to deprive this plaintiff and his fellow stockholders of the exclusive right of electing a majority of the directors of the society. I also agree with the result reached by Mr. Justice WOODWARD that this is embraced within the reserve power of the Legislature. The proposition seems to be established by controlling authority, and, if the deductions drawn from the cases to be cited are logical, may hardly be considered an open question. Grobe v. Erie County Mutual Ins. Co., 39 App. Div. 183, 57

N. Y. Supp. 290, was unanimously affirmed in the Court of Appeals (169 N. Y. 613, 62 N. E. 1096), upon the opinion read in the Appellate Division. In that case the voting power was taken from the policy holders of a mutual insurance company, upon whom it was conferred by the charter, and given to the stockholders. In the case at bar, part of the voting power is proposed to be taken from the stockholders and given to the policy holders. The principle involved is necessarily the same. Speaking of the constitutional question involved in the reserve power to alter or repeal, Mr. Justice Follett said:

"Pursuant to this provision, the statutes under which this corporation was organized and by which it must be controlled were passed, and every person who became a member of the corporation did so with full knowledge that it might be at any time changed from a mutual to a stock corporation, upon certain terms and conditions, and that under this provision of the Constitution these terms might at any time be changed by the Legislature."

In Looker v. Maynard, 179 U. S. 46, 21 Sup. Ct. 21, 45 L. Ed. 79, the authority of the Legislature to pass an act permitting each stockholder of a corporation theretofore organized to cumulate his votes upon any one of more candidates for directors was upheld. If the Legislature has power, under its reserve power to alter, to provide for cumulative voting, and thereby change the voting value of shares, and deprive the majority of the exclusive absolute right of electing all the directors, it follows that the right of the stockholders may be limited to the extent of vesting in policy holders the privilege of electing a majority of the directors. The power of the stockholder is not annihilated; his right to a voice in the choice of directors is still present—a diluted power, if you please, or a weaker voice, as you will, but still his interest remains.

The third proposition is whether the proposed amended charter is authorized by the provisions of the statute under which the directors have acted. Upon that question I am unable to agree with the views of Mr. Justice WOODWARD. The directors of the defendant society assumed to place in operation the new proposed charter (from which quotation has been made) under and by virtue of the power conferred upon insurance companies in this respect by section 52 of the insurance law (chapter 690, p. 1955, Laws of 1892, as amended). To reach a correct conclusion upon this branch of the case, it is necessary to examine with some care the changes which this section has undergone since its enactment. It originally passed in the year 1853. It then read as follows:

"Section 52. Reorganization of Existing Corporations and Amendment of Certificates. Any domestic insurance corporation existing or doing business at the time this chapter takes effect, and not incorporated under any law repealed by this chapter, may, by a vote of a majority of its directors, accept the provisions of this chapter and amend its charter to conform with the same, upon obtaining the consent of the superintendent of insurance thereto in writing; and thereafter it shall be deemed to have been incorporated under this chapter. Every domestic insurance corporation may amend its charter or certificate of incorporation by inserting therein any statement or matter which might have been originally inserted therein."

But chapter 463, p. 887, of the Laws of 1853, under which the defendant society was organized, was specifically repealed by the insurance law of 1892, and hence the first sentence of the section just quoted

would not apply to the society, because that was applicable only to insurance companies not incorporated under any law repealed by that act. The Legislature of 1893, however, amended this section (chapter 725, p. 1802, Laws of 1893), so as to read as follows:

"Sec. 52. Reorganization of Existing Corporations and Amendments of Certificates. Any domestic corporation existing or doing business at the time this chapter takes effect, may, by a vote of a majority of its directors or trustees accept provisions of this chapter and amend its charter to conform with the same, upon obtaining the consent of the superintendent of insurance thereto in writing; and thereafter it shall be deemed to have been incorporated under this chapter, and every such corporation in reincorporating under this provision, may for that purpose so adopt in whole or in part a new charter, in conformity herewith, and include therein any or all changes from its existing charter, to cover and enjoy any or all the privileges and provisions of· existing laws which might be so included and enjoyed if it were originally incorporated thereunder."

Section 1 of the act also provided that nothing in any of its sections should apply to any insurance corporation incorporated under articles 6 and 7 of the insurance law.

Since the defendant society was, at the time of the action of the board of directors now complained of, a domestic corporation, existing and doing business when the insurance law took effect, the first sentence of section 52 thereof, of course, applied to it. And so the section existed, as far as it is important for us to inquire, until the year 1901, when by chapter 722, p. 1779, of the Laws of that year the following paragraph was added thereto:

"This section shall apply to insurance corporations organized under or subject to article six of the insurance law, as well as to insurance corporations organized under special charters or articles two and ten of the insurance law; all contracts, policies and certificates issued by such corporations prior to accepting the provisions of this chapter shall be valued as one year term of insurance at the ages attained, excepting when such contracts, policies or certificates shall provide for a limited number of specified premiums or for specified surrender values, in which case they shall be valued as provided in article two, section eighty-four of the insurance law."

It is urgently insisted that this amendment of 1901 operated to exclude from the purview of the section corporations not organized under article 6 of the insurance law, or under special charters, or articles 2 and 10 of the insurance law; it being contended that the amendment of 1901 was meant to limit the application of section 52. The claim is, however, it seems to me, without merit. It was manifestly the purpose of the amendment to extend, rather than limit, the operation of the section, and to add to the number of corporations which were to be subject to the provisions thereof. By virtue, then, of the provisions of section 52, the board of directors of the defendant society undertook, by their resolution of March 21, 1905, to effect the adoption of a new charter, that the corporation might enjoy the privileges and provisions of the laws now existing; such being the manifest intention of the enactment in section 52 of the insurance law. One of the provisions of such existing law, the advantage of which the directors sought to obtain for the defendant society, is apparently contained in section 70 of the insurance law, which, after providing that 13 or more persons may become a corporation for the purpose of making insurance upon the lives of persons, by making and filing in the office of

the superintendent of insurance a certificate signed by them, stating their intention, and setting forth a copy of the charter, prescribes what that charter may contain in this language:

"It shall state the name of the proposed corporation, the place where it is to be located, the kind of insurance to be undertaken, and under which of the foregoing subdivisions it is authorized, the mode and manner in which its corporate powers are to be exercised, the manner of electing its directors and officers, a majority of whom shall be citizens and residents of this state, the time of such election, the manner of filling vacancies, the amount of its capital, and such other particulars as may be necessary to explain and make manifest the objects and purposes of the corporation."

And it is asserted that, because the privilege is accorded the 13 or more persons to adopt a charter which shall declare "the manner of electing its directors and officers," it was within the power of these directors to propose for adoption a charter which should give the power of electing the majority of the directors to the policy holders, although under the original charter the policy holders had no such right. It is not clear to my mind, however, that the language is sufficiently broad for the purpose. The word "manner," while more comprehensive in its meaning and uses than either the word "method" or "mode," may with much reason be held to mean in that connection the procedure of electing directors and officers, rather than a definition of the classes in whom the suffrage should lie. This is a debatable question, not entirely free from doubt, which it is unnecessary to decide, for elsewhere in the statutes is to be found general authority for a provision in articles of incorporation that others than stockholders may compose such electorate. At the time of its passage, section 20 of the general corporation law (chapter 687, p. 1807, Laws 1892) provided:

"At every election of directors and meeting of the members of any corporation, every member who is not in default in the payment of his subscriptions upon his stock or disqualified by the by-laws, shall be entitled to one vote, if a non-stock corporation, and, if a stock corporation, to one vote for every share of stock held by him for ten days immediately preceding the election or meeting."

And it is said that by force of this section of the general corporation law stockholders have the indefeasible exclusive right to vote for directors. But by chapter 355, p. 975, of the Laws of 1901, that section was amended so as to provide that:

"*Unless otherwise provided in the certificate of incorporation,* every stockholder of record of a stock corporation shall be entitled at every meeting of the corporation to one vote for every share of stock standing in his name on the books of the corporation; and at every meeting of a non-stock corporation, every member, unless disqualified by the by-laws shall be entitled to one vote."

The words italicized express a new statutory provision, which, in effect, declares, and it is thereby clearly contemplated, that a certificate of incorporation may lawfully provide that others than stockholders may vote. Hence incorporators of a new company might provide in the articles of incorporation that the voting power should be lodged elsewhere than in the stockholders, where it usually resides; and if such a provision is competent by virtue of that amendment in the case of a new corporation, it is clearly competent, pursuant to the provisions

of section 52 of the insurance law, in the case of a new charter being adopted by the defendant society.

It is apparent, therefore, that statutory authority exists for the action of the board of directors of the defendant society in the adoption of a charter which accords to policy holders the privilege of electing a majority of the directors, thereby restricting the privilege of stockholders in that respect. Inasmuch as there was reserved to the Legislature the power to pass laws by which this change might be effected, and inasmuch as the change itself does not impair the obligation of any contract of the plaintiff, or deprive him of property without due process of law, the interlocutory judgment appealed from should be reversed, and the demurrer to the complaint sustained.

The appeal from the order granting a temporary injunction should likewise prevail, for the injunction cannot stand upon a complaint which fails to state a cause of action.