FRANKLIN B. LORD, JR., et al., as Executors of FRANKLIN B. LORD, Deceased, Appellants, *v.* THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Respondent, Impleaded with Others.

Constitutional law — right of legislature to amend charter of corporations — life insurance corporations — constitutionality and effect of statute (L. 1906, ch. 326, § 13) permitting life insurance corporations to amend charter so that policyholders, as well as stockholders, may vote for directors.

The provision in the Revised Statutes that "the charter of every corporation, that shall hereafter be granted by the legislature, shall be subject to alteration, suspension and repeal in the discretion of the legislature" (1 R. S. 600, § 8), was the result of public alarm and protest caused by

the decision of the Supreme Court of the United States in the *Dartmouth College* case. This statute became the permanent policy of the state when the Constitution of 1846 was adopted and in the revision of 1894.

It is provided by section 11 of chapter 463 of the Laws of 1853 that all companies formed under that act "shall be subject to all the provisions of the Revised Statutes in relation to corporations, so far as the same are applicable, except in regard to annual statements and other matters herein otherwise provided for." This exception does not refer to the provisions of section 20 of that act, that "every charter created by or under the laws of this state for the purposes aforesaid shall continue until repealed," and the Revised Statutes were not so modified as to prevent the legislature from touching the charter of a company organized under the Laws of 1853, except by repeal.

The limitation in the act of 1853 was not intended to repeal the reserved power to alter charters. The provision for a permanent charter until repealed was to enable life insurance companies to make and perform their peculiar contracts which differ from any others in the length of time they may last.

There is a distinction between the repeal of a charter and the repeal of a franchise. The charter of a corporation is the law which gives it existence as such; that is, its general franchise, which can be repealed at the will of the legislature. A special franchise is the right granted by the public to use public property for a public use, but with profit, such as the right to build and operate a railroad in the streets of a city. Such a franchise, when acted upon, becomes property and cannot be repealed, unless power to do so is reserved in the grant, although it may be condemned upon making compensation. (*People* v. *O'Brien*, 111 N. Y. 1, distinguished.)

The power to amend a general law of incorporation involves power to amend charters taken out under that law. Both by the Constitution and the Revised Statutes the legislature has the reserved power to so amend the law under which a charter has been taken out as to carry with it a corresponding amendment of the charter itself either directly or by authorizing the corporation to make the change. The right to amend a charter, however, does not include the right to take away money invested in reliance thereon or property acquired thereunder. When the legislature has created a corporation and has given it the power to acquire property, it cannot take away the property so acquired without providing for compensation, since such property is protected by the Federal Constitution.

The right of a stockholder to vote for directors is the right to protect property from loss and make it effective in earning dividends. To absolutely deprive him of the right to vote is to deprive him of an essential attribute of his property. To so undermine that right as to essentially affect its power of protection would, under ordinary circumstances, undermine the right to property involved in the ownership of stock.

The variations between the statute of 1853 and section 52 of the Insurance Law (L. 1906, ch. 326, § 13) as to the right to enfranchise policyholders are differences of detail not of substance, and were within the control of the legislature under the reserved powers which it possesses. The object of the reservation in the charter was to permit the enfranchisement of policyholders, and that is all that the legislature has authorized. The legislature may, under its reserve power, amend any charter in any respect, not fundamental, when the object of the corporation and property acquired by it are considered. The statute of 1906 authorizes no change in principle since the old charter permitted mutualization, but it simply allowed the object contemplated by the charter to be effected by a method varying in unessential details from that provided by the charter itself. So far as the act applies to this case it is sanctioned by the Constitution of this state and is not in conflict with the Constitution of the United States.

The contention that the legislature did not amend the charter of defendant, by authorizing the directors to amend it, is overruled. When the legislature authorizes a course of procedure whereby a charter may be acquired or amended, action in conformity thereto does not create the charter nor make the amendment, but both come into existence through an operation of the statute. The amendment is the act of the legislature, the same as the charter itself, and neither has existence except as conferred by statute.

The objection that enough of the directors, who were not directors *de jure*, to affect the result voted for the amendment, whereby the charter was mutualized, is not well founded. Passing by the fact that all were directors *de facto*, section 20 of the Stock Corporation Law (L. 1892, ch. 688, amd. L. 1903, ch. 238) provides that "policyholders of an insurance corporation shall be eligible to election as directors whether or not they be stockholders."

The legislature authorized the directors of defendant to enfranchise policyholders with the consent of stockholders holding a majority of the stock. Stockholders and directors voted for an amendment which conferred upon policyholders the right to vote for twenty-eight out of fifty-two directors, and limited stockholders to the right to vote for but twenty-four. *Held,* this action deprived the stockholders of the right to vote for all the directors. While the directors had the right to limit the power of the policyholders to vote for only a part of the directors, they had no right to thus limit the power of the stockholders.

*Lord* v. *Equitable Life Assur. Society,* 126 App. Div. 937, reversed.

(Argued January 7, 1909; decided February 9, 1909.)

Appeal, by permission, from an order of the Appellate Division of the Supreme Court in the second judicial depart-

ment, entered May 12, 1908, which affirmed an interlocutory judgment of Special Term sustaining a demurrer to the complaint.

The following question was certified : " Does the complaint in this action, consisting of the amended complaint and the supplemental complaint, set forth a cause of action against the defendant, The Equitable Life Assurance Society of the United States ? "

The nature of the action and the facts, so far as material, are stated in the opinion.

*Edward M. Shepard* and *Henry De Forest Baldwin* for appellants. Plaintiffs' right to vote for a majority of the directors is a property right. (*People* v. *Hawkins,* 157 N. Y. 1 ; *Matter of Jacobs,* 98 N. Y. 98 ; *People ex rel.* v. *Otis,* 90 N. Y. 48 ; *Wynehamer* v. *People,* 13 N. Y. 387 ; *Stokes* v. *C. T. Co.,* 186 N. Y. 285 ; 1 Cook on Corporations [4th ed.], 1, § 12 ; *Lamkin* v. *Palmer,* 24 App. Div. 260 ; *Jones* v. *C., etc., R. R. Co.,* 30 Atl. Rep. 614 ; *A., etc., Co.* v. *State Board,* 56 N. J. L. 389 ; *Commonwealth* v. *Dalzell,* 152 Penn. St. 217.) The legislature has not reserved to itself power to amend or alter the charter of the Equitable Society. (*L. G. Co.* v. *C. G. Co.,* 115 U. S. 683 ; *New Jersey* v. *Yard,* 95 U. S. 104 ; *Scotland Co.* v. *M., etc., Ry. Co.,* 65 Mo. 123 ; *Citizens' Bank* v. *Owensboro,* 173 U. S. 636.) The constitutional reservation to the legislature does not include power to alter or suspend a charter granted under the general law unless the reservation be in the charter itself or in the general law. (*People* v. *O'Brien,* 111 N. Y. 1.) The legislative power to amend, where it exists, does not include power to deprive stockholders of property such as the right to choose directors. (*People* v. *O'Brien,* 111 N. Y. 1 ; *Miller* v *State,* 15 Wall. 478 ; *Holyoke* v. *Lyman,* 15 Wall. 500 ; *Shields* v. *Ohio,* 95 U. S. 319 ; *Sinking Fund Cases,* 99 U. S. 700 ; *Stanislaus Co.* v. *S. J., etc., C. Co.,* 192 U. S. 201 ; *S. L., etc., Co.* v. *Paul,* 173 U. S. 404 ; *Detroit* v. *D. & H. P. R. Co.,* 43 Mich. 140 ; *Mayor, etc.,* v. *T. T. S. R. R. Co.,* 113 N. Y.

311; *Matter of N. L. Assn.*, 64 N. J. L. 217.) The new charter needed for valid adoption by the society, and the acts of 1906, needed for their valid acceptance the act of the board of directors assented to by a majority composed of validly qualified directors. As between the corporation and its own stockholders, directors who were such *de facto*, but not *de jure*, could not make charter or other organic changes. (*Waterman* v. *C., etc., R. Co.*, 139 Ill. 658; *P. M. Ins. Co.* v. *Westcott*, 14 Gray, 440; *People* v. *A. & S. R. R. Co.*, 55 Barb. 344; *Schwab* v. *F. M. Co.*, 21 Utah, 258; *Moses* v. *Tompkins*, 84 Ala. 613; *State* v. *Curtis*, 9 Nev. 325; *McAvoy* v. *City of New York*, 52 App. Div. 485; *B. S. Assn.* v. *Buffalo*, 118 N. Y. 61; *Matter of Main Street*, 98 N. Y. 454; *F. M. Assn.* v. *Brown*, 29 N. J. Eq. 121.) The Insurance Law, as amended in 1906, does not authorize a life insurance company having a capital stock to deprive its stockholders of the right to vote for every director. (L. 1906, ch. 326, § 13.)

*William B. Hornblower* and *Allan McCulloh* for respondent. Since the adoption of the Constitution of 1846 the legislature of this state has been expressly prohibited from creating any corporation, or authorizing the creation of any corporation, except subject to the reserved right of the legislature at any time to alter or repeal the charter. (N. Y. Const. of 1846, art. 8, § 1.) The charter of the Equitable Life Assurance Society is subject to the reserved power of the legislature to alter from time to time. (*Maxwell* v. *Dow*, 176 U. S. 581; *Aldridge* v. *Williams*, 3 How. [U. S.] 9; *U. S.* v. *Freight Assn.*, 166 U. S. 318; *U. S.* v. *U. P. R. R. Co.*, 91 U. S. 79; Cooley on Const. Lim. [7th ed.] 101.) The technical objections taken by appellants' counsel in the supplemental complaint to the regularity of the proceedings to amend the defendant's charter are not well taken. (*Matter of S. E. S. M. Co.*, 4 N. Y. Supp. 174; *Langan* v. *Francklyn*, 20 N. Y. Supp. 404; *People* v. *Hills*, 1 Lans. 202; *Wallace* v. *Walsh*, 125 N. Y. 26; *Vernon Society* v. *Hills*, 6 Cow. 23;

*Mickles* v. *R. C. Bank,* 11 Paige, 118; *P. M. Ins. Co.* v. *Westcott,* 14 Gray, 440; *Moses* v. *Tompkins,* 84 Ala. 613.) The election of part of the directors by policyholders and part by stockholders is authorized by the law as amended. (L. 1906, ch. 326, § 13.)

VANN, J.   This action was brought by Franklin B. Lord, now deceased, to restrain the defendant corporation from so amending its charter as to give policyholders the right to vote for a majority of the directors and to limit stockholders to the right to vote for a minority only.   It is continued by his executors, through a supplemental complaint, in order to set aside as illegal and void an amendment to the charter purporting to have been made after the date of the amended complaint and to enjoin the officers of said company from holding or taking part in any election of directors held otherwise than as prescribed by the original charter.

By stipulation of the parties the amended and the supplemental complaints are to be read together and treated as the sole complaint in the action, and while there are individual defendants who were permitted to intervene, for convenience the corporation will be referred to as if it were the only party defendant.   The word "mutualization" has been used throughout this litigation to express the idea of so changing the charter of a stock life insurance company as to confer upon the policyholders the right to vote for directors, and it is used with that meaning in this opinion.

The plaintiff is the owner of thirty-six shares of the capital stock of the defendant, which is a life insurance corporation organized in 1859 pursuant to the provisions of chapter 463 of the Laws of 1853 as from time to time amended.   That act authorized the corporators to prepare a charter in the form of a certificate of incorporation, in which should be set forth among other things the method of electing directors and the manner in which the corporate powers should be exercised.   A majority of the directors were to be citizens of this state, but no other qualification was specified in the stat-

ute.   According to the certificate filed by the corporators, the
amount of the capital stock is the sum of $100,000, divided
into one thousand shares of the face value of one hundred
dollars each.   The board of directors is composed of fifty-
two members, each of whom is required to be " a proprietor
of at least five shares of the said capital stock."

The charter also contained the following provisions : " The
business of this company shall be to make insurances upon
the lives of individuals, and every insurance appertaining
thereto, or connected therewith ; and to grant, purchase, or
dispose of annuities, as set forth in the act aforesaid, passed
June 24, 1853, and amendments thereto."

" The holders of the said capital stock may receive a semi-
annual dividend on the stock so held by them, not to exceed
three and one half per cent. of the same ; such dividends to
be paid at the times, and in the manner designated by the
directors of said company.   The earnings and receipts of said
company, over and above the dividends, losses and expenses
shall be accumulated.   The corporate powers of said com-
pany shall be vested in a board of directors,  *  *  *.   In
the election of directors, every stockholder in the company
shall be entitled to one vote for every share of stock held by
him, and such vote may be given in person, or by proxy.   At
any time hereafter, the board of directors, after giving notice
at the two previous stated meetings, by a vote of three-fourths
of all the directors, may provide that each life policyholder,
who shall be insured in not less than five thousand dollars,
shall be entitled to one vote at the annual election of
directors, but such vote shall be given personally, and not by
proxy."

" The insurance business of the company shall be con-
ducted upon the mutual plan.  *  *  *  The officers of the
company, within sixty days from the expiration of the first
five years from December 31, 1859, and within the first sixty
days of every subsequent period of five years, shall cause a
balance to be struck of the affairs of the company, which
shall exhibit its assets and liabilities. both present and con-

tingent, and also the net surplus, after deducting a sufficient amount to cover all outstanding risks and other obligations. Each policyholder shall be credited with an equitable share of the said surplus," which was to be used to purchase additional insurance, or at the election of the policyholder of an annuity, to be applied in the reduction of future premiums. " In case of death, the amount standing to the credit of the party insured at the last preceding striking of balance as aforesaid, shall be paid over to the person entitled to receive the same; and the proportion of surplus equitably belonging to him or her, at the next subsequent striking of balance, shall also be paid, when the same shall have been ascertained and declared."

The defendant now has outstanding upward of five hundred thousand policies, and the amount insured is nearly a billion and a half of dollars, but " only a minority of the said policies are for insurance in the sum of as much as five thousand dollars." The gross surplus amounts to upward of $80,000,000, the accumulations for the benefit of policyholders to over $410,000,000, and the net surplus, after providing for all policies outstanding, to a large sum. All the net surplus has never been divided, for the management has ever had in mind the stability of the company and the need of guarding its investments from the effect of fluctuation in the value of securities.

This appeal involves the legality of an effort to so " mutualize " the defendant's charter as to allow the policyholders to elect twenty-eight of the directors, leaving the twenty-four remaining to be elected by the stockholders. This was sought to be effected by the directors, against the protest of the plaintiff's testator, under the authority of the legislature as expressed in the Insurance Law, passed in 1892, and amended in the respect under consideration in 1901 and 1906. (L. 1892, ch. 690, § 52; L. 1901, ch. 722, § 1; L. 1906, ch. 326, § 12.)

The first effort, made under the amendment of 1901, did not succeed, as it was held by the Appellate Division upon a demurrer to the original complaint herein that while the leg-

islature had the power, it had not so exercised it as to enable the directors to change the corporate control of the company " by giving to policyholders power to participate in the election of directors." (109 App. Div. 252.) This led to the act of 1906, under which a second effort was made to effect the same purpose and the action of the directors in this regard having been sustained by the courts below, is now before us for review.

The primary question is whether the legislature had power to pass the act of 1906, which provides in substance that any stock life insurance company may by the vote of a majority of the directors, when authorized by stockholders holding a majority of the capital stock, confer upon its policyholders the right to vote for all or any less number of the directors. This depends upon certain provisions of the Constitution and the Revised Statutes when read in connection with the statute under which the defendant was incorporated. The Revised Statutes, passed in 1827, provided that " The charter of every corporation, that shall hereafter be granted by the legislature, shall be subject to alteration, suspension and repeal, in the discretion of the legislature." (1 R. S. 600, § 8.) The Constitution, as adopted in 1846 and also as revised in 1894, provides that " Corporations may be formed under general laws ; but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the Legislature, the objects of the corporation can not be attained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed." (Const. art. 8, § 1.)

The appellants claim that the general power to amend corporate charters as reserved by the legislature in the Revised Statutes, does not apply to those taken out under the act of 1853, because that act provides by section eleven that all companies formed thereunder " shall be subject to all the provisions of the Revised Statutes in relation to corporations, so far as the same are applicable, except in regard to annual statements and other matters herein otherwise specially pro-

vided for;" and by section twenty that "Every charter created by or under the laws of this State for the purposes aforesaid, shall continue until repealed." It is insisted that the exception mentioned in the earlier section refers to the part quoted from the later and, hence, that the Revised Statutes were so modified as to prevent the legislature from touching the charter of the defendant, except by repeal.

History forbids this construction. The provision in the Revised Statutes was the result of public alarm and protest caused by the decision of the Supreme Court of the United States in the celebrated *Dartmouth College* case, decided in 1819. (*Trustees Dartmouth College* v. *Woodward*, 4 Wheat. 518.) In that case it was held that a charter granted in 1769 by the king of England to the trustees of a college in New Hampshire, was a contract so protected by the Federal Constitution that the state could not modify it in any material respect without the consent of the corporation. As soon as it was realized that the principle of the decision applied to the charters of all corporations and placed them forever beyond the power of legislation, the situation caused great anxiety throughout the nation. It was felt that danger threatened the public welfare when a thing created by law was placed beyond the control of law. The determination became general that if existing charters were stronger than the state, no future charter should be, and action followed accordingly along the line suggested by Mr. Justice STORY in his concurring opinion in the *Dartmouth College* case, that if a state wished to alter charters it must reserve the right to do so. (Id. p. 712.) In this state as in others the feeling was almost universal that there never should be another corporation with powers beyond the control of the legislature, and when the revisers reported the provision quoted from the Revised Statutes with an exception in favor of "religious, literary and charitable societies," the legislature brushed away the exception and made all charters subject to alteration in its discretion, and this became the permanent policy of the state when the Constitution of 1846 was adopted. Construc-

tion should accord with the broad purpose to remedy what was regarded as a great evil. The *Dartmouth College* decision had not passed from the minds of the people or their representatives when the act of 1853 became a law, and it is hardly possible that the legislature in authorizing the formation of corporations for a purpose then almost unknown and regarded as experimental, would defy public opinion and depart from its established policy by surrounding those corporations with a perpetual barrier against its own control. Such a construction should not be adopted unless no other is possible within reason, for it would oppose the lesson of history and give legislative sanction to methods repudiated by the people.

What then, was the purpose of the legislature in subjecting all charters under the act of 1853 to the provisions of the Revised Statutes except as to " other matters " therein " otherwise specially provided for ? " This question is easily answered. The section quoted from the Revised Statutes occurs in a title relating to " the general powers, privileges and liabilities of corporations." Under that title certain powers, limitations and liabilities are extended to every corporation whether specified in its charter or not, and as some' of them are obviously inconsistent with those conferred and imposed upon the new kind of corporation authorized by the act of 1853, the application of the Revised Statutes was limited accordingly. The limitation was not intended to repeal the reserved power to alter charters, which the history of the times shows was regarded as of vital importance. The provision for a permanent charter, until repealed, was to enable life insurance companies to make and perform their peculiar contracts, which differ from all others in the length of time they may last. By comparing the first statute passed in relation to life and fire insurance with the act of 1853 which took its place in part, the purpose of that provision is clearly disclosed. (L. 1849, ch. 308.) All charters under the act of 1849 were to be of thirty years' duration, except those of life insurance, and the time they were to run was not specified,

but, as it was further provided, " the legislature may at any time alter, amend or repeal this act, or dissolve and provide for the closing up the business and affairs of any company formed under it." (§ 15.)    In 1853 when the legislature again took up this subject, this act was replaced by two others, one relating to life and the other to fire insurance companies. (L. 1853, chs. 463 and 466.)    The charters of the latter were to last thirty years, subject to the right of amendment and repeal, while those of the former were to ." continue until repealed," but not to continue unamended until repealed. (Id. ch. 466, § 26; ch. 463, § 20.)    The reason for the distinction is found in the nature of the contracts which the two classes of companies were authorized to make, for the one class may be limited as to duration while the other cannot.    Fire insurance is measured by so many months or years, while life insurance, as the name indicates, can be measured only by the life of the subject insured.    A life insurance company limited to an existence of thirty years could not contract with certainty of fulfillment in a single instance.    Hence, the distinction made was required by the character of the contracts provided for and as the duration of life companies was left open by the act of 1849, in order to remove any doubt upon the subject the act of 1853 provided that such charters should continue until repealed.    This is made so clear by Judge WOODWARD in an excellent opinion written upon the first appeal to the Appellate Division that no further discussion is required. We unite with him in saying that " The sole purpose of section twenty in the Life Insurance Law of 1853 was to remove all time limit and to permit companies organized under its provisions to make life contracts of insurance.    Or, in other words, it was the purpose of the legislature to enable companies organized under this law to make the contracts and to execute them in conformity with the obvious purpose of such contracts.    It was not designed to limit the provisions of the Revised Statutes in reference to the power to amend, alter and repeal charters, but took the place of the thirty years'

limitation to be found in the fire insurance act of the same year." (109 App. Div. 252, 260.)

We are also of the opinion that the right to amend, reserved in the Constitution, applies to the charter of the defendant and other corporations, because power to amend a general law of incorporation involves power to amend charters taken out under that law. The distinction sought to be made between the power to amend a law and the power to amend a charter granted thereunder, if sustained, would subvert the object of the Constitution, for it would permit the legislature to do the precise thing which it was the purpose of that instrument to prevent. What was that purpose? Contemporary history shows, as we have already seen, that it was to prevent the grant of charters which could not be altered by the legislature, and this purpose should never be lost sight of in construing that part of the Constitution under consideration. Unless this was effected nothing was effected, for the legislature could amend a general law as to corporations thereafter formed without permission and as a matter of course. No constitutional sanction was required for the exercise of that authority, because the power to enact a law carries with it power to amend that law so far as its effect in the future is concerned. Power was needed, however, to give the amendment retroactive effect upon what had been done under the law before it was amended, and, as we said in a recent case, " the reservation became a part of the charter of every corporation subsequently organized." (*Pratt Institute* v. *City of New York,* 183 N. Y. 151, 162.) This explains the presence of the provision in the Constitution, and unless it was placed there for that purpose it was placed there without effect, and thus an act of the utmost solemnity in legislation becomes wholly without object or result. The key to correct construction of both Constitution and statute is the evil sought to be remedied thereby. While existing charters were immune, there was a fixed and unalterable intention to do away with the effect of the *Dartmouth College* case upon the charter of every corporation subsequently granted.

The intention was absolute and final that no charter should get away from legislative control.

Nothing decided in *People* v. *O'Brien* (111 N. Y. 1) is inconsistent with these views, although, as sometimes happens when discussion is elaborate, some unessential things were said that are somewhat at variance with what we now say, as well as with what was said in the great opinion itself. What was decided in that case? Three statutes were before the court and the claim was made that each was passed in violation of the Constitution. (L. 1886, chs. 268, 271 and 310.) The first simply repealed the charter of "The Broadway Surface Railroad Company." That was held constitutional. The second and third were general acts and provided for winding up the affairs of corporations whose charters had been repealed by the legislature in such a way as to interfere with special franchises, as well as mortgages and traffic contracts. These were held unconstitutional. As the vote of the judges shows, no other question was decided, but necessarily involved in that was the great question whether the right to "maintain tracks and run cars on Broadway survived the dissolution of the corporation."

In order to fully appreciate the decision it may be useful to mark the distinction between the repeal of a charter and the repeal of a franchise. Here definitions become important. The charter of a corporation is the law which gives it existence as such. That is its general franchise, which can be repealed at the will of the legislature. A special franchise is the right, granted by the public, to use public property for a public use, but with private profit, such as the right to build and operate a railroad in the streets of a city. Such a franchise, when acted upon, becomes property and cannot be repealed, unless power to do so is reserved in the grant, although it may be condemned upon making compensation. As we recently said: "The general franchise of a corporation is its right to live and do business by the exercise of the corporate powers granted by the state. The general franchise of a street railroad company, for instance, is the special

15

privilege conferred by the state upon a certain number of persons known as the corporators to become a street railroad corporation and to construct and operate a street railroad upon certain conditions. Such a franchise, however, gives the corporation no right to do anything in the public highways without special authority from the state, or some municipal officer or body acting under its authority. When the right of way over a public street is granted to such a corporation, with leave to construct and operate a street railroad thereon, the privilege is known as a special franchise, or the right to do something in the public highway, which, except for the grant, would be a trespass." (*People ex rel. Metr. St. Ry. Co. v. State Board of Tax Com'rs*, 174 N. Y. 417, 435.)

The right to be a corporation is frequently called a franchise, as it is in one sense, but not in the sense that the grant of a right to build a railroad in a public street is a franchise, and it is unfortunate that the same word is used with widely different meanings, for it leads to confusion unless qualified by an appropriate adjective, such as "general" or "special." The right to be a corporation, or the corporate right of life, is inseparable from the corporation itself. It is a part of it and cannot be sold or assigned. That franchise is general and dies with the corporation, for it cannot survive dissolution or repeal. On the other hand, grants to do something in the public streets or special franchises are not a part of the corporation. They can be made to an individual with the same legal force or effect as to a corporation. Unless there is some legislative restriction they can be mortgaged and sold. They are no part of corporate life, if owned by a corporation, any more than they are a part of individual life if owned by a human being. When the vote of the judges is analyzed it will be seen that all that was decided in the *O'Brien* case is that the repealing act was valid and that the special franchise survived the death of the corporation, or, in other words, that the special franchise to build a railroad in Broadway lived after the legislature had taken away the life of the corporation owning it. (*Boswell* v. *Security Mut. Life Ins. Co.,*

193 N. Y. 465.)   The decision was made by the votes of five judges only, two of whom concurred in the result upon the grounds above stated.   The opinion was not approved by a majority of the judges.   The distinction between the right to repeal a general law authorizing charters, and the right to repeal a charter taken out under the general law, was not involved and what was casually said on that subject was the *dictum* of the eminent jurist who wrote the opinion.

Our conclusion upon the primary question involved is that **7** both by the Constitution and the Revised Statutes the legislature has the reserved power to so amend the law under which a charter has been taken out as to carry with it a corresponding amendment of the charter itself, either directly, or by authorizing the corporation to make the change. (*Pratt Institute* v. *City of New York*, 183 N. Y. 151, 162; *People ex rel. Cooper Union* v. *Gass*, 190 N. Y. 323; *People ex rel. Roosevelt Hospital* v. *Raymond*, 194 N. Y. 189.)   Any other conclusion, in view of the immense number of corporations now organized under existing laws, would be a disaster to society and a menace to the state. Those charters would stand like the laws of the Medes and Persians, unchangeable by all the power of the state, for although they could be repealed, they could not be amended. Other authorities bearing upon the subject will be noticed hereafter.

The right to amend a charter, however, does not include the right to take away money invested in reliance thereon, or property acquired thereunder.   The power of amendment reserved by the Constitution or statutes of a state does not permit interference with property or property rights, because they are protected by the Constitution of the United States.   When the legislature has created a corporation and has given it power to acquire property, it cannot take away the property  so  acquired without providing for compensation. (*Mayor, etc., of N. Y.* v. *Twenty-third St. Ry. Co.*, 113 N. Y. 311, 317.)   No reservation, for instance, could authorize a law giving to policyholders the capital stock

belonging to the stockholders. As the property of stock-holders cannot be given away either in whole or in part, it follows that the gift of any right so connected with their property as to be essential to its preservation and existence, would be a violation of primary rights. Hence, the second question presented is whether the right of a stockholder to vote is a vested right of property.

After the grant of the original charter certain persons, and among them the father of the plaintiff's testator, subscribed for stock to the amount of the issue authorized, and upon payment therefor became the stockholders of the corporation. They thus invested the sum of $100,000 on the faith of the charter, and by inheritance or assignment the present stock-holders are their successors in interest. According to the allegations of the complaint, which on demurrer we must accept as true, the stock has so increased in value that in 1905 a controlling interest of five hundred and one shares was sold for $2,500,000, or at the rate of about $5,000 per share. By the old charter the stockholders were authorized to elect the directors, and all the corporate powers of the company were vested in the board of directors.

The stockholders of a corporation, as such, have no direct power of management, and even by united action they can neither bind nor loose the company by making contracts or controlling investments. The capital stock owned by them is property. It represents an investment upon which they are entitled to dividends, provided they are earned, and whether they can be earned or not depends on the management. Indeed, the safety of the entire investment depends on the power to manage the corporate business, because, even in the case of the defendant, with its immense surplus, careless and improvident management might impair the value of the stock or utterly destroy it. The right to vote for directors, there-fore, is the right to protect property from loss and make it effective in earning dividends. In other words, it is the right which gives the property value and is part of the property itself, for it cannot be separated therefrom. Unless the

1909.]    Lord v. Equitable Life Assur. Society.    229

N. Y. Rep.]    Opinion of the Court, per Vann, J.

stockholder can protect his investment in this way he cannot protect it at all, and his property might be wasted by feeble administration and.he could not prevent it. He might see the value of all he possessed fading away, yet he would have no power, direct or indirect, to save himself, or the company from financial downfall. With the right to vote, as we may assume, his property is safe and valuable. Without that right, as we may further assume, his property is not safe and may become of no value. To absolutely deprive him of the right to vote, therefore, is to deprive him of an essential attribute of his property. To so undermine that right as to essentially affect its power of protection, would, under ordinary circumstances, undermine the right to property involved in the ownership of stock and we have so held. (*Stokes* v. *Continental Trust Company*, 186 N. Y. 285.)

These are general rules and under " ordinary circumstances," therefore, the legislature could not by direct action essentially impair the right of the plaintiff to vote as a stockholder, nor could it do so indirectly, by authorizing the directors with the consent of only a majority of the stockholders, to so amend the charter as to have that effect. The circumstances under which the attempt to mutualize the charter of the defendant was made, however, were not " ordinary," because that right was conferred upon the directors by the original charter itself, although the right was to be exercised in a different manner from that provided by the act of 1906. The old charter, although it organized a stock company, not only limited dividends to seven per cent a year, but required that all earnings and receipts in excess of dividends, losses and expenses should be accumulated. Even if the surplus multiplied the capital, as it has in fact, eight hundred times, still but seven per cent on the sum of $100,000 could be paid in dividends to the stockholders. But the charter did not stop there, for it further provided that the business of the company should be conducted on the mutual plan, which means that the policyholders were not simply creditors of the corporation, but were to share in the surplus which they created upon

some basis.   That basis was defined, for at fixed periods each
policyholder was to be credited " with an equitable share " of
the net surplus.   This did not mean that all of it was to be
divided among the policyholders, but that a division should
be made upon some equitable basis consistent with the safety
and prosperity of the company, when changes in the value of
securities and other business hazards were taken into account.
They became the equitable owners of an equitable share in
the surplus to the extent provided by the charter, which
makes no distinction between the surplus arising from insur-
ance proper and that arising from the sale of annuities, unless
it may be implied from the division directed to be made upon
an equitable basis.   Finally, and more important than all else,
mutualization was provided for by authorizing the directors,
by a vote of three-fourths of their number, to provide that
each life policyholder holding insurance to the amount of not
less than five thousand dollars should be entitled to one vote
at the annual election.

Thus the charter carried in its soil the seeds of mutualiza-
tion, planted by the founders of the company in readiness to
sprout at the will of three-fourths of the directors, regardless
of the wishes of the stockholders, as such.·  They took their
stock subject to the right thus reserved to the directors, and
were bound to abide by the result, for the reservation in a
certificate of incorporation of the right to amend the charter
in any manner permitted by law is as binding on the stock-
holders as any other part of the certificate.

What did the act of 1906 authorize that was not permitted
by the original charter itself?   There was no difference in
substance, for mutualization, which might deprive the stock-
holders of control, was permitted by both, but there was some
difference in details.   The charter provided a way, but did
not make it exclusive.   The statute authorizes every domestic
insurance corporation to " amend its charter or certificate of
incorporation by inserting therein any statement or matter
which might have been  originally inserted therein; and
*   *   *   by inserting therein any powers which, at the time

of such amendment, may have been conferred by law upon domestic insurance corporations engaged in a business of the same general character, or which might be included in the certificate of incorporation of a domestic insurance company organized under any general law of this State for a business of the same general character." .It further authorizes a majority of the directors, with the consent of stockholders representing at least a majority of the capital stock, to confer upon the policyholders, " or upon such policyholders as may have a prescribed amount of insurance upon their lives the right to vote for all or any less number of the directors " in any manner not inconsistent with the other provisions of the act. (Insurance Law, § 52, as amended, L. 1906, ch. 326, § 13.) The old charter authorized the directors, by a vote of three-fourths of their number, to enfranchise policyholders holding not less than $5,000 of insurance, but the right was to be exercised in person and not by proxy. The statute contains a provision for notice to the stockholders, but none, unless by implication, for notice to the directors, while the charter requires notice to be given at two stated meetings of the directors previous to the meeting at which the action to mutualize is taken.

These variations are differences of detail not of substance, and they were within the control of the legislature under the reserved power which we have held it possesses. The object of the reservation in the charter was to permit the enfranchise. ment of policyholders, and that is all the legislature has authorized. Mutualization is the substance, the method is detail, and when the substance is under the control of the legislature, control of the details follows as a necessary incident. All things permitted by the old charter the legislature had the power to authorize, with such modification as to details as it regarded as proper in the interest of public policy, without trespassing upon vested rights. Even if the result would place the policyholders in control of the affairs of the company, the stockholders took their stock subject to that contingency, and cannot now lawfully complain of what they or

their predecessors consented to when they invested in the capital stock.

We think the act of 1906, so far as it is now before us, is a valid exercise of legislative power, forbidden by neither State nor Federal Constitution. The authorities relied upon are not directly in point for the situation is without precedent, but it is clear that the tendency of authority, both state and national, is to hold that the legislature has wide latitude of amendment when the general power is reserved either by constitution or statute. An early case went far in this direction when it held an act valid which made stockholders liable for debts, although the general law of incorporation as well as the certificate of incorporation itself provided that they should not be liable. (*Matter of Oliver Lee & Co.'s Bank,* 21 N. Y. 9; affirmed, *sub nom. Sherman* v. *Smith,* 1 Black, 587.) The court in this state relied upon *Schenectady & Sar. P. R. Co.* v. *Thatcher* (11 N. Y. 102) and *Buffalo & N. Y. City R. R. Co.* v. *Dudley* (14 N. Y. 336), but the Supreme Court of the United States treated the question as original and decided it without the citation of authorities.

So where, as the result of facts unnecessary to mention, a minority of stockholders had the right to elect nine of the thirteen directors and the majority stockholder, a city, but four, an act which in effect authorized the city to elect seven and the other stockholders but six, was held valid. (*Miller* v. *State,* 15 Wall. 478.) Referring to the power reserved by our Constitution and statute, the court said that "it may be safely affirmed that the reserved power may be exercised, and to almost any extent, to carry into effect the original purposes of the grant or to secure the due administration of its affairs so as to protect the rights of the stockholders and of creditors, and for the proper disposition of the assets. * * * Attempt is made in this case to show that the right to elect all of the directors except four had become vested in the stockholders owning a minority of the shares, and that the amendatory act giving to the city the power to elect seven impairs that vested right, but the court is entirely of a different opinion, as the

legislature in conceding that right made the concession subject to the reserved power to alter or repeal the charter. * * *."

According to the statute under which it was incorporated, a certain mutual fire insurance company could be changed into a stock corporation with the consent of two-thirds of its members.  Subsequently an act was passed abrogating this requirement and providing that the change might be made with the consent of the superintendent of insurance, the president of the company and three-fourths of the directors.  The act was sustained, although it took away from the members, absolutely and without their consent, the right to make the change and conferred it upon others.  (*Grobe* v. *Erie Co. Mut. Ins. Co.,* 39 App. Div. 183; affirmed on opinion below in 169 N. Y. 613.)

The case of *Atty.-Genl. ex rel. Dusenbury* v. *Looker* (111 Mich. 498; 179 U. S. 46) is valuable, because the facts resemble those in the case before us.  The law under which a mutual life insurance company of Michigan was organized gave to every shareholder at the election of the directors, the right to one vote for every share of capital standing in his name.  By a subsequent act the legislature provided for cumulative voting by the stockholders, each of whom was authorized to " give one candidate as many votes as will equal the number of directors multiplied by the number of shares of his stock; or to distribute them on the same principles among as many candidates as he shall think fit."  The language of the Constitutions of New York and Michigan is substantially the same as far as power to alter and amend a statute is concerned.

In sustaining the statute the Supreme Court of the United States closed its opinion as follows : " Remembering that the *Dartmouth College* case, (which was the cause of the general introduction into the legislation of the several States of a provision reserving the power to alter, amend or repeal acts of incorporation,) concerned the right of a legislature to make a change in the number and mode of appointment of the trustees or managers of a corporation, we cannot assent to the theory that an express reservation of the general power does not

**234** Lord *v.* Equitable Life Assur. Society. [Feb.,

Opinion of the Court, per Vann, J. [Vol. 194.

secure to the legislature the right to exercise it in this respect."

Thus, while the old charter gave a majority of the stockholders the right to elect all of the directors, by the amendment this right was taken away, for by the cumulative method of voting a minority of the stockholders might elect some of the directors.

According to the law of its incorporation a stock company could issue preferred stock only upon consent of all the stockholders, yet a later act authorizing such issue upon consent of but two-thirds of the stockholders was upheld. (*Hinckley* v. *Schwarzchild & S. Co.*, 107 App. Div. 470 ; 193 N. Y. 599. See, also, *Colby* v. *Equitable Trust Co.*, 124 App. Div. 262 ; 192 N. Y. 535.)

In *Wright* v. *Minn. Mut. Life Ins. Co.* (193 U. S. 657, 663) a life insurance association organized on the mutual plan was subsequently authorized by statute, upon consent of the superintendent of insurance and a majority of the stockholders, to change its business to the regular premium plan, and a change made accordingly, against the objection of the plaintiff and others, was sustained. The court said : " Where the right of amendment is reserved in the statute or the articles of association, it is because the right to make changes which the business may require is recognized, and the exercise of the privilege may be vested in the controlling body of the corporation. * * * The argument for appellants is that, having begun as an assessment company, the plan can never be changed without the consent of all interested. But we have seen that the right of amendment was given in the original articles of association. There was no contract that the plan of insurance should never be changed. On the contrary, it was recognized that amendments might be necessary. There was no vested right to a continuation of a plan of insurance which experience might demonstrate would result disastrously to the company and its members. We are cited to the statutes of many states authorizing similar changes and transfer of membership, but to no case holding legislative authorization of a change

of this character to work the impairment by the state of the obligation of a contract."

A case arose in this state involving the same section of the Insurance Law now under consideration as amended in 1901, but not as amended in 1906.  It also involved the power of amendment reserved by our State Constitution to which allusion has already been made.  The court held that "where there is a reserved power in the legislature to alter, amend or repeal charters, a law permitting mutual life associations to re-incorporate as regular life insurance companies is not unconstitutional as impairing the obligation of the contracts existing between such associations and their policyholders, or as depriving such policyholders of their property without due process of law." (*Polk* v. *Mutual Reserve Fund Life Assoc. of New York,* 207 U. S. 310, 326.)   Among other things the court said : " It is immaterial whether the power to alter the charter is reserved in the original act of incorporation, or in the articles of association under a general law, or in a constitution in force when the incorporation under a general law is made.  *  *  *  It is said that in the *Wright* case the change was made by the majority of the members of the association, while in the case at bar it was made by a majority of the directors without the consent of the members.   But in each case the change was made in conformity with the provisions of the law authorizing it, and if the legislature has the constitutional power to authorize the change by the vote of a majority of the members it has the power to authorize the change by a vote of a majority of the directors.  The rights of a protesting member are no more impaired in one case than in the other.  *  *  *  The whole argument of the complainants upon these constitutional questions, though enveloped in many words and presented in divers forms, rests upon a single proposition.  That proposition is that they, having become members of an association insuring lives upon the co-operative and assessment plan, and being, therefore, in a sense, both insurers and insured, have a vested right that the association shall not, without their con-

sent, engage in other kinds of insurance, which may and probably will indirectly affect, for better or worse, their relations to it. The trouble with this proposition is that it was made and denied in the *Wright* case."

The latest utterance of the Supreme Court of the United States upon the subject, so far as we are advised, appears in *Berea College* v. *Commonwealth of Kentucky* (211 U. S. 45). In that case it appeared that the charter of a college defined its business as " the education of all persons who may attend its institution of learning at Berea." By an act of the legislature passed years after the institution was incorporated, it was made unlawful for any corporation to maintain a " college, school or institution where persons of the white and negro races are both received as pupils for instruction." While there was a strong dissent by two of the justices, the court sustained the statute as valid and said : " It is undoubtedly true that the reserved power to alter or amend is subject to some limitations, and that under the guise of an amendment a new contract may not always be enforceable upon the corporation or the stockholders ; but it is settled that a power reserved to the legislature to alter, amend or repeal a charter authorizes it to make any alteration or amendment of a charter granted subject to it, which will not defeat or substantially impair the object of the grant, or any rights vested under it, and which the legislature may deem necessary to secure either that object or any public right."

While many other cases have been cited by counsel upon either side, to whom we are much indebted for research and suggestion, we think we have called attention to those most nearly in point. The decision in all the cases which arose in this state was based on those provisions of our Constitution or the Revised Statutes, already considered, and it was held in all that as the reservation of power to amend was part of every corporate charter, the stockholders took their stock not only subject thereto, but in assent thereto. Several of the cases, while not in direct, are in close analogy to the case in hand, because they involve the power of control, which was

virtually taken away by a statute passed in assertion of the right to amend charters. If, in the *Miller* case, the minority of stockholders could be deprived of the right to elect a majority of the directors, which had vested subject to the reservation of the power to amend; and in the *Looker* case the power of the majority to elect all, under the same reservation, had become subject to the right of a minority to elect some, why could not the legislature authorize all policyholders to vote for all or any less number of the directors, even if it might deprive the stockholders of control?

The principle established by the authorities seems to be that the legislature under its reserved power may amend any charter in any respect that is not fundamental when the object of the corporation and property acquired by it are considered. Granting that it may not convert a corporation into something entirely foreign to the object for which it was created, such as turning an insurance company into a railroad company for instance, still it can regulate investments, methods of administration and details of procedure in the interest of the public and of all concerned. The public is interested in the proper management of a company with such enormous assets as the defendant possesses, because, if for no other reason, those assets were mainly derived from the public. The statute before us authorized no change in principle, for the old charter permitted mutualization, but it simply allowed an object contemplated by the charter to be effected by a method varying in unessential details from that provided by the charter itself. Mutualization in any form would necessarily affect to some extent the power of the stockholders to elect directors.

We have carefully examined but do not review many cases cited by counsel bearing somewhat upon the question under consideration, as we think that the authorities in closest touch with that question all point in the direction of the conclusion we have reached; while no authority stands in the way of the law we now announce, that the act of 1906, in so far at least as it applies to this case, is sanctioned by the Constitution of

the state of New York and is not in conflict with the Constitution of the United States.

Several questions of minor importance in principle, but one of them serious in its effect upon the judgment appealed from, remain to be considered.

The validity of the " voting trust," so called, created by the judicious action of the controlling stockholder, who delegated to three distinguished citizens the power to vote upon his stock during a specified period, is not now questioned.

We mention, only to overrule, the position that the legislature did not amend the charter by authorizing the directors to amend it. When the legislature authorizes a course of procedure whereby a charter may be acquired or amended, action in conformity thereto does not create the charter or make the amendment, but both come into existence through the operation of the statute. The amendment is the act of the legislature the same as the charter itself, and neither has existence except as conferred by statute.

While all of the directors present voted for the amendment whereby the charter was mutualized, complaint is made that enough to affect the result were not directors *de jure.* Passing by the fact that all were directors *de facto,* the answer to this objection is found in section twenty of the Stock Corporation Law, which provides that " Policyholders of an insurance corporation shall be eligible to election as directors, whether or not they be stockholders." (L. 1892, ch. 688, § 20 ; L. 1906, ch. 238, § 1.)

The intention of the legislature is made clear by the General Corporation Law, which commands that "A reference in a general law to a class of corporations described in accordance with this classification shall include all corporations theretofore formed belonging to such class." (L. 1892, ch. 687, § 2.)

We now reach the final question. The legislature authorized the directors of the defendant to enfranchise policyholders, with the consent of stockholders holding at least a majority of the capital stock. Stockholders owning 667

shares out of one thousand in all, voted for the amendment, while those owning 114 shares, including the plaintiff's testator, voted against it. Thereupon the directors by the unanimous vote of all who were present, thirty-three in number, adopted the amendment, which conferred upon policyholders the right to vote for 28 out of the 52 directors and limited stockholders to the right to vote for but 24.

The legislature authorized the enfranchisement of policyholders, and did not authorize the disfranchisement of stockholders, yet the action taken deprived the latter of the right to vote for all the directors. It was for this reason that Judge Willard Bartlett concurred only in the result on the first appeal to the Appellate Division. (109 App. Div. 270.) He there said, " that under existing laws there is no power in the board of directors of the Equitable Life Assurance Society so to amend its charter as to deprive a stockholder of the right to participate in the election of every director of the corporation. While the board may permit policyholders to vote for every director, it cannot lawfully exclude stockholders from the exercise of the same right."

We think he was right. It matters not, since a question of power is involved, that the change made might operate more favorably to the stockholders than the change authorized. The change made deprived the stockholders of the right to vote for all the directors, although it gave them absolute power to elect twenty-four out of the fifty-two. The change authorized would not have deprived them of this right, although it might have resulted in depriving them of any representation on the board. Still, as we have held, the right of a stockholder to vote for directors is property and he cannot be deprived of it without his consent, even by giving him what others might regard as a better substitute. He cannot be deprived of his own by the offer of something better unless he agrees to take it. It may be that the right to vote for all would enable the stockholders to elect all, in case of lack of interest on the part of the policyholders, which is said to be not unusual, or through a combination with one of several par-

ties into which the policyholders might be divided. They had a right to the chance to elect all. The chance might not be worth much, but it was the property of the stockholders and they have been deprived of it by the action of the directors, taken without authority. While the directors had the right to limit the power of the policyholders to vote for only a part of the directors, they had no right to thus limit the power of the stockholders, because, if for no other reason, the statute does not authorize it.

We have thus decided every question worthy of discussion that is presented by the record in order to guide future action if further effort is made to mutualize the charter of the defendant. We sustain the action of the legislature, but reverse the action of the courts below solely upon the ground stated, because we feel that the law calls upon us to maintain the rights of stockholders, even if they stand in their own light.

The order and interlocutory judgment appealed from is reversed, with costs in all courts, and the question certified is answered in the affirmative, with leave to the defendant to withdraw its demurrer and plead over within twenty days upon payment of costs.

EDWARD T. BARTLETT, J. (dissenting). I agree with the views expressed by Judge VANN in reference to the following important questions presented by this appeal. The opinion states that the primary question is whether the legislature had power to pass the act of 1906, and adds after discussing the question in detail: " Our conclusion upon the primary question involved is that both by the Constitution and the Revised Statutes the Legislature has the reserve power to so amend the law under which a charter has been taken out as to carry with it a corresponding amendment of the charter itself, either directly, or by authorizing the corporation to make the change."

The opinion further states: " We think the act of 1906, so far as it is now before us, is a valid exercise of legislative power, forbidden by neither State nor Federal Constitution."

The opinion also states in substance that where the legislature authorizes a course of procedure, whereby a charter may be acquired, or amended, "action in conformity thereto does not create the charter or make the amendment, but both come into existence through the operations of the statute."

I am unable, however, to agree with the views expressed in the opinion, as follows: "We now reach the final question. The Legislature authorized the directors of the defendant to enfranchise policy holders, with the consent of stockholders holding at least a majority of the capital stock. The stockholders owning 667 shares out of 1,000 in all, voted for the amendment, while those owning 114 shares, including the plaintiff's testator, voted against it. Thereupon the directors by the unanimous vote of all who were present, thirty-three in number, adopted the amendment, which conferred upon policy holders the right to vote for twenty-eight out of the fifty-two directors and limited stockholders to the right to vote for but twenty-four."

Without further quoting from the opinion it is in substance held that the power given the original stockholders to vote for all of the directors is a vested property right of which they cannot be deprived; that the act of 1906, so far as it seeks to accomplish this result, ought not to be upheld.

I am unable to agree with this statement of the law as applied to the facts disclosed by this record. This case in many of its features is *sui generis*. There are upward of five hundred thousand outstanding policies of insurance; amount insured nearly a billion and a half of dollars; gross surplus upward of $80,000,000 ; accumulations for the benefit of policyholders upwards of $410,000,000. It is argued on behalf of the plaintiff not only that the right of the stockholders to vote for a majority of the directors is a property right of which they cannot be deprived, but that the policyholders of the defendant are merely creditors. In the light of the impressive figures above quoted, it is very clear that the law governing the rights of directors as applied to such corporations as railroads and other business companies has no appli-

16

cation to the case at bar. The policyholders are in no legal sense mere creditors, but are the real parties in interest and the beneficiaries of the vast accumulations of the Equitable Company ; at least this is the fact so long as the corporation is a going concern. The capital stock of the defendant is $100,000, divided into one thousand shares of $100.00 each. At the time of its incorporation under the General Insurance Law of 1853, as in force in 1859, the entire amount of the capital was deposited with the comptroller of the state, apparently as a guaranty fund. The fund necessary for conducting this enormous business during these many years last past was furnished by the policyholders. The charter of the company provided, among other things, that the holders of the capital stock might receive a semi-annual dividend on the same not to exceed three and one-half per cent ; in other words, these original stockholders were limited in the aggregate to a return of seven thousand dollars a year on their investment.

It seems very clear under the facts here disclosed that it was never contemplated that these original stockholders and their successors should be entitled to the perpetual control of the business of this society. At the time the affairs of the defendant were examined by the superintendent of insurance it was disclosed that one young man held a majority of the stock and was practically in control. The situation was relieved by the consent of this stockholder to join in the creation of a stock trust which has been declared valid.

I agree with the argument of the learned counsel for the respondent that the original charter of the Equitable did not contemplate a perpetual control of the society, or a perpetual right to elect directors thereof, since it was provided in article IV of the charter that "At any time hereafter the board of directors after giving notice at the two previously stated meetings, by a vote of three-fourths of all the directors, may provide that each life policy holder who shall be insured in not less than five thousand dollars, shall be entitled to one vote at the annual election of directors, but such vote shall be in person and not by proxy." This amendment of

the charter made it possible, by a change in electing directors, to deprive the stockholders of the right to control the society, or to elect the board of directors.

The respondent's counsel further argues that the charter, as amended by the law of 1906, is "less radical than the change provided for in the original charter, since it retains for the stockholders the right to elect twenty-four of the fifty-two directors, instead of conferring upon policy holders the right to vote for all of the directors as provided by the original charter. It removes the restriction as to the amount of policy, so as to give the policy holders the right to vote without regard to amount, and it authorizes the vote to be given by proxy as well as in person, and in these respects is more liberal than the scheme provided for by article IV of the original charter. The point on which we insist, however, is that the original charter anticipated that in some form and to some extent the power to elect directors might be given to policy holders by the board of directors, and to that extent the right to elect directors might be taken from the stockholders. It is, therefore, evident that the right to elect directors was not regarded by the original subscribers as an inalienable or perpetual property right, but as a right which might be taken from them in the future."

I am, therefore, of the opinion that the act of 1906, in so far as it authorizes the policy holders to vote for twenty-eight out of the fifty-two directors and limits stockholders to the right to vote for but twenty-four, is constitutional and should be sustained. Notwithstanding the fact that I agree with my brother Vann as to the disposition made by him of several of the important questions in this case, I dissent from the decision about to be made.

Cullen, Ch. J., Werner, Willard Bartlett, Hiscock and Chase, JJ., concur; Edward T. Bartlett, J., reads dissenting opinion.

Order and judgment reversed, etc.